**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

_____
                                                         )
KATIA HILLS and CYNTHIA ALLEN,          )
Individually and on behalf of others          )
similarly situated,                                     )
                                                         )
              Plaintiffs,                              )          Civil No. 3:17-cv-00556-JD-MGG
v.                                                        )
                                                         )
AT&T MOBILITY SERVICES LLC            )
a/k/a AT&T MOBILITY LLC and              )
AT&T SERVICES, INC.,                          )
                                                         )
              Defendants.                           )
_____ )


**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Katia Hills and Cynthia Allen bring this action against AT&T Mobility Services LLC a/k/a AT&T Mobility LLC ("AT&T Mobility") and AT&T Services, Inc. ("AT&T Services") (collectively "AT&T" or "the Company") on behalf of themselves and others similarly situated for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e *et seq.*  Plaintiffs also bring individual claims under Title VII; the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*  In support of their Second Amended Complaint, Plaintiffs allege and state the following:

## NATURE OF THE ACTION

1.     In amending Title VII by enacting the PDA, Congress recognized that "discrimination against pregnant women is one of the chief ways in which women's careers have been impeded and women employees treated like second-class employees."  123 Cong. Rec. 10,527 (1977) (statement of Rep. Hawkins).

2.     But Plaintiffs did not receive the protections of this critical law.  Instead, they faced discrimination and suffered adverse employment consequences—including, ultimately, termination—when AT&T refused to "excuse" absences for pregnancy, childbirth, and related medical conditions under its "Sales Attendance Guidance" ("SAG") policy.

3.     AT&T's SAG policy—which applied to Plaintiffs and continues to apply to non-exempt, non-managerial employees in company-owned stores—imposes a "point" or a fraction of a "point" for unexcused absences from work, late arrivals, or early departures.  Once an employee exceeds a threshold of points, she is terminated.  Points also impact an employee's ability to be promoted and to transfer stores.

1

4.     Although the SAG policy provides for excused absences, late arrivals, or early departures in 13 delineated situations—including "Approved leave of absence," "Approved Short Term Disability," "Approved Job Accommodations," and "Federal/State/Municipal mandated Leaves (i.e., FMLA, ADAAA, etc.)," *see* infra ¶ 27—nowhere does the policy mention pregnancy, childbirth, or related medical conditions.

5.     The SAG policy applies company-wide and is administered by AT&T's Centralized Attendance Group ("CAG").

6.     Upon information and belief, AT&T assigned points to Plaintiffs—who worked in different stores in different states—for their absences, late arrivals, and early departures related to pregnancy, childbirth, and related medical conditions—while routinely overlooking the absences, late arrivals, and early departures of their similarly situated coworkers.

7.     AT&T's refusal to excuse absences, late arrivals, and early departures related to pregnancy, childbirth, or related medical conditions constitutes intentional discrimination in violation of Title VII.

8.     Furthermore, upon information and belief, AT&T's SAG policy has a disparate impact on female workers affected by pregnancy, childbirth, or related medical conditions, in violation of Title VII.

9.     Pregnancy is a fact of life for employers and employees alike. Almost 85 percent of women will have at least one pregnancy during their careers, and virtually all pregnant women experience at least "morning sickness" with their pregnancies—and typically numerous other symptoms that interfere with work and are disabling.  Even an uncomplicated pregnancy requires regular doctor's visits, at increasing frequency as pregnancy progresses.  And research estimates

that over 250,000 women per year are denied the workplace accommodations they need for their pregnancies, including excused absences for medical care.

10.    Plaintiffs therefore bring Title VII claims on behalf of themselves and all non-exempt, non-managerial female employees in AT&T's corporate stores nationwide who were denied excused absences pursuant to AT&T's Sales Attendance Guidance policy.

11.    Plaintiff Katia Hills also brings individual Title VII claims related to the sexual harassment she endured at AT&T, an individual claim under the ADA for AT&T's failure to provide reasonable accommodations for her pregnancy-related disabilities, and an individual claim under the FMLA for AT&T's interference with and retaliation for Ms. Hills's efforts to access protected leave.

12.    Plaintiff Cynthia Allen further brings an individual claim under the ADA for AT&T's failure to provide reasonable accommodations for her pregnancy-related disabilities, and an individual claim under the FMLA for AT&T's interference with and retaliation for her efforts to obtain excused absences for her pregnancy and to care for her sick son.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

14.    Venue is proper in this District under 28 U.S.C. § 1391 because Ms. Hills resides here, AT&T does business here, and many of the unlawful practices at issue occurred within this District.

## PARTIES

15.    Plaintiff Katia Hills is a woman and a resident and citizen of Granger, Indiana.

3

From April 2014 until July 2015, Ms. Hills was an employee of AT&T Mobility in its retail store at 2707 Cassopolis Street in Elkhart, Indiana.

16.     Plaintiff Cynthia Allen is a woman and a resident and citizen of Las Vegas, Nevada. From approximately December 2012 through April 2017, Ms. Allen was an employee of AT&T Mobility in its retail stores at 2540 Broadway, 30 Rockefeller Plaza, and 16 W. 34th Street in New York City and 920 South Rampart Boulevard in Las Vegas, Nevada.

17.     AT&T Mobility is a limited liability corporation organized under the laws of Delaware, with its principal place of business in Atlanta, Georgia.  AT&T Mobility is a subsidiary of AT&T, Inc.  On information and belief, at all relevant times, AT&T Mobility was engaged in commerce or an industry affecting commerce within the meaning of the FMLA, employed in excess of 50 employees during each of 20 or more calendar workweeks, and was an "employer" within the meaning of Title VII (as amended by the PDA) and the FMLA.

18.     AT&T Services, Inc. is a shared services company incorporated under the laws of Delaware, with its principal place of business in Dallas, Texas.  AT&T Services is a subsidiary of AT&T, Inc.  On information and belief, at all relevant times, AT&T Services was engaged in commerce or an industry affecting commerce within the meaning of the FMLA, employed in excess of 50 employees during each of 20 or more calendar workweeks, and was an "employer" within the meaning of the FMLA.  Also on information and belief, AT&T Services authored and otherwise controlled the policies and decisions governing Plaintiffs' employment, including but not limited to policies and decisions with respect to attendance and FMLA benefits.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.     On May 9, 2016, Ms. Hills filed a timely charge of discrimination with the Equal

4

Employment Opportunity Commission ("EEOC"), alleging that AT&T engaged in sex, pregnancy, and disability discrimination and retaliation in violation of Title VII (as amended by the PDA) and the ADA.  Ms. Hills amended that charge on October 17, 2017 and January 22, 2018; these amendments included class-wide allegations.

20.     In order to protect against an expiring statute of limitations on her claims under the FMLA, which similarly alleged unlawful application of the disputed attendance policy, Ms. Hills filed the present case on July 14, 2017.  *See* Compl., ECF No. 1.

21.     On February 20, 2018, Ms. Allen filed a timely charge of discrimination with the EEOC, alleging that AT&T engaged in sex, pregnancy, and disability discrimination and retaliation in violation of Title VII (as amended by the PDA) and the ADA.

22.     Plaintiffs requested Notices of Right to Sue from the EEOC on April 30, 2018, and they received Ms. Allen's Right to Sue letter on May 7, 2018 and Ms. Hills's Right to Sue letter on May 8, 2018.  This Second Amended Complaint is timely filed following Plaintiffs' receipt of their Right to Sue letters.

## FACTS GIVING RISE TO THIS ACTION

### A.     AT&T's ATTENDANCE POLICY

23.     AT&T maintains a "Sales Attendance Guidance" ("SAG") policy for non-exempt, non-managerial AT&T Mobility employees in company-owned retail stores, which governs the attendance policies and procedures in its stores nationwide.  Upon information and belief, AT&T has maintained such an attendance policy for the duration of Plaintiffs' employment with the Company; such a policy was in place when each Plaintiff joined AT&T.

24.     Under this policy, AT&T assigns a "point" or a fraction of a point to an employee

5

who is absent, arrives late, or departs early.  Sales associates retain points they have incurred for approximately twelve months.

25.     After an employee receives approximately four points, AT&T may limit her ability to transfer to another store or be promoted.  Upon information and belief, after seven points, it may put her on "final notice."  And, upon information and belief, AT&T may terminate her after eight points, as determined by the Company in its sole discretion.

26.     AT&T's policy states that absences, early departures, or late arrivals may be excused only if they fall within a specified set of categories, limited to the following:

- o   Approved leave of absence
- o   Scheduled/Approved vacation
- o   Jury Duty
- o   Qualified bereavement
- o   Military Leave
- o   Company recognized Holidays (unless scheduled to work on a Holiday)
- o   Approved Short Term Disability
- o   Approved Job Accommodations
- o   Federal/State/Municipal mandated Leaves (i.e., FMLA, ADAAA, etc.)
- o   Company initiated closings (i.e. inclement weather, etc.)
- o   Contracted time off (Union business)
- o   Court subpoena (excused to extent as outlined per Labor Agreement)
- o   Approved/Company Mandated Time Off (i.e., EWP, vacation, disciplinary time, etc.)

27.     Despite enumerating thirteen bases for excused absences, the SAG policy on its face does not list pregnancy, childbirth, or related medical conditions.

28.     The SAG policy further requires that employees report absences or other needed schedule changes to AT&T at least one hour before their shift.

29.     The SAG policy also provides that if an employee accrues a specified number of points within a twelve-month period, for "any unscheduled time away" from their shift "regardless of reason," this "will result in termination absent extraordinary circumstances as determined by

6

the Company in its sole discretion."

30.     Upon information and belief, AT&T's CAG administers the SAG policy and determines whether an employee's time out of work is "excused."

31.     An employee can receive "combined discipline"—i.e., more than one disciplinary action—"up to and including termination" for multiple points accrued during an extended unexcused absence or series of absences.

**B.     KATIA HILLS**

32.     Ms. Hills worked for AT&T in its retail store at 2707 Cassopolis Street in Elkhart, Indiana from April 2014 until her discharge in mid-July 2015, immediately after returning from parental leave.

33.     AT&T hired Ms. Hills in April 2014 as a Sales Support Representative.  In that position, she provided clerical support to the store's managers and Sales Representatives.

34.     Ms. Hills performed well in this position, helping sales staff close numerous sales and assisting with Spanish-speaking customers; within roughly four months of her hire, she was promoted to Sales Representative, a progression that typically took at least twice that long.

35.     As a Sales Representative, Ms. Hills was responsible for selling cellphones and tablets, as well as various phone and data plans, to customers.  Throughout her employment with AT&T, Ms. Hills performed well and routinely ranked above average in monthly evaluations on sales performance, specifically on the critical "new phone lines" criteria, for her store and area. She was the only female Sales Representative at the store, which employed between five and six Sales Representatives during most of Hills's tenure there.

36.     Throughout Ms. Hills's employment with AT&T, AT&T managers and corporate

employees frequently excused male and/or non-pregnant employees who arrived late, left early, missed work, or took extended breaks, even though AT&T did not excuse pregnant employees for late arrivals, early leaving, missing work, or extended breaks.

37.     After Ms. Hills became pregnant in October 2014, AT&T began to enforce the attendance policy more strictly against her, while continuing to grant leniency to her non-pregnant colleagues.

38.     During Ms. Hills's pregnancy, she experienced severe nausea during the night and in the morning, which impeded her ability to sleep and to work.  She also developed serious dizziness.

39.     These physical symptoms of Ms. Hills's pregnancy occasionally caused her to be late or to miss work, and she consistently was penalized with a point or fraction of a point, pursuant to AT&T's SAG policy.  Over the course of her pregnancy, Ms. Hills was late to her shift at AT&T only five times and had only four unexcused absences, all of which should have been excused.  On those occasions, her manager, Dion McGlown, would inform her that a team in AT&T's corporate structure, including district manager Jason Jenkins, oversaw the assignment of points and that there was nothing he could do to excuse her absences.

40.     In contrast, Ms. Hills's non-pregnant colleagues were not given points despite infractions such as arriving late for the start of their shifts, leaving work for extended periods such as to drive family members to various obligations, or returning late from lunch breaks.  Ms. Hills's then-boyfriend and now husband, Nathan Hills, another Sales Representative at the store, was repeatedly spared points when he was absent, or late simply due to oversleeping.  Similarly, a male coworker named Michael Mascola left regularly on Saturdays for extended lunch breaks during

8

the store's busiest hours to attend a child's soccer games, but he did not receive points from AT&T for these absences.

41.     Between January and March 2015, Ms. Hills's pregnancy became increasingly difficult.  In addition to suffering from severe nausea, she began experiencing back and pelvic pain—as the pregnancy aggravated her previously diagnosed scoliosis—prompting her doctor to refer her for physical therapy.

42.     To attend physical therapy, she was absent once in February and 6-15 minutes late on two occasions, once in early March and once on April 3, 2015.

43.     AT&T penalized Ms. Hills for these absences.  Despite knowing that Ms. Hills's absences were the result of pregnancy-related impairments, AT&T did not raise with her the possibility of altering her schedule to accommodate her pregnancy-related disabilities.  Instead, AT&T assigned her more points, putting Ms. Hills within two points of being fired, pursuant to the terms of AT&T's attendance policy.

44.     As of April 7, 2015, Ms. Hills had worked full-time for AT&T for one year, qualifying her for leave, including intermittent leave, under the FMLA.

45.     Through April 2015, Ms. Hills continued experiencing pelvic pain with walking. She also became unable to sleep at night, had constant headaches, and was constantly nauseated.

46.     On or around April 21, Ms. Hills told her doctor that she was experiencing contractions by the end of each day, which her doctor diagnosed as Braxton Hicks contractions.

47.     Late in Ms. Hills's pregnancy, as an accommodation for her pregnancy-related impairments, she sought a temporary transfer into the Sales Support Representative position she previously held, which was less taxing than her Sales Representative job and was vacant at the

time.  AT&T denied her request, and the Sales Support Representative position remained vacant.

48.     Ms. Hills also was denied permission to postpone her attendance at a training session taking place hours away, a trip that she knew would be difficult due to her chronic nausea, dizziness, and fatigue.  She was also denied permission to attend the same session as Mr. Hills or her other coworkers, so she could avoid driving.  In contrast, a non-pregnant colleague was permitted to forgo off-site training due to family obligations, and AT&T brought a trainer to her area.  AT&T declined to bring a trainer to Ms. Hills and forced her to travel to the training session on her own, even though the session involved a product roll-out scheduled for approximately September, well after her child was due to be born.

49.     The absences that resulted in Ms. Hills's final two points occurred in May 2015.

50.     On May 4, 2015, Ms. Hills was diagnosed with cholestasis, a condition that causes bile buildup in the liver and results in intense itching and fever.  Cholestasis is dangerous to the developing fetus and typically requires prescription steroids and early delivery.  The condition exacerbated Ms. Hills's physical debilitation, with extreme itchiness and sleeplessness at night, which in turn caused greater dizziness and further nausea during the day.

51.     On May 15, Ms. Hills went to the hospital with bleeding, an absence that AT&T eventually excused as qualified leave under the FMLA.

52.     On May 16, Ms. Hills's symptoms—itchiness, fatigue, dizziness, and nausea— were so severe that she could not go to work, resulting in her final accrued point, although she was not made aware of it at the time.

53.     Ms. Hills sought FMLA coverage for her May 4 and May 16 absences so that she would not accrue points for them.

54.     On May 26, 2015, Ms. Hills's doctor directed her to start her maternity leave early, due to her pregnancy-related impairments.  At that time, on information and belief, she had accrued six points for lateness and absenteeism.

55.     Despite AT&T's having been notified that Ms. Hills had been diagnosed with cholestasis on May 4, 2015—based on medical certification she had submitted on May 26 in support of her request to begin her maternity leave—it took no steps to initiate discussions with her about excusing those absences as "Federal/State/Municipal mandated Leaves [sic] (i.e., FMLA, ADAAA, etc.)," as provided by its attendance policies and as required by the ADA.

56.     Ms. Hills delivered a baby boy on June 1, 2015, less than one week later.

57.     When she returned from maternity leave on July 14, 2015, however, Ms. Hills learned that AT&T refused to "excuse" the May 2015 absences because her health care provider— who had submitted FMLA paperwork for Ms. Hills's pregnancy—had not submitted additional paperwork that AT&T required to excuse Ms. Hills's absences, contending that that additional paperwork did not accurately reflect Ms. Hills's medical condition and limitations.  AT&T thus assigned Ms. Hills's final two points based on these pregnancy-related absences.

58.      On July 16, 2015, AT&T fired Ms. Hills for accruing too many points under the Company's SAG policy.  Mr. McGlown informed her that he had tried to advocate for her keeping her job, but that the decision was "out of his hands," or words to that effect.

59.     None of Ms. Hills's male colleagues were fired for accumulating points during the roughly fifteen months she was employed by AT&T.

60.     AT&T showed hostility to Ms. Hills's pregnancy in other ways.  Throughout Ms. Hills's pregnancy, Mr. McGlown repeatedly stated his belief that Ms. Hills would not return to

work after her maternity leave.  On multiple occasions, he told her that "women don't come back to work after giving birth," or words to that effect, and referred negatively to other women he had supervised who had not returned from maternity leave.

61.     Mr. McGlown also resisted Ms. Hills's efforts to learn about the kinds of leave available to her under AT&T's policies and pressured her not to take the full twelve weeks of leave to which she would be entitled under the FMLA, calling her at home during her maternity leave to inquire about her anticipated return date and attempting to entice her to return early.

62.     On one occasion, when Ms. Hills asked about the possibility of working a part-time schedule after having her baby, Mr. McGlown told her he would permit her to do so only if she agreed to take just four weeks of maternity leave.

63.     Additionally, both before and during Ms. Hills's pregnancy, she was subjected to harassment by Sales Representative Michael Paradine.  Mr. Paradine regularly commented on Ms. Hills's body, his opinion of her attractiveness, and her sexual relationship with Nathan Hills.  Mr. Paradine routinely made these comments in front of co-workers and store managers, but none of the store managers took any action.  Ms. Hills also frequently reported Mr. Paradine's statements to Mr. McGlown and sought his intervention, but Mr. McGlown did nothing.

64.     After Ms. Hills became pregnant in October 2014, Mr. Paradine's comments increased in frequency.  He also began to reference changes in Ms. Hills's body as a result of her pregnancy.  Distressed, in or around January 2015, Ms. Hills implored Mr. McGlown to take action.  He advised her to file a formal complaint with AT&T's Human Resources Department ("HR"), which she did.  On information and belief, HR conducted an investigation that included interviews of only Mr. McGlown, Ms. Hills, and Mr. Paradine, but did not include any of the

12

witnesses to these events.

65.     AT&T did not inform Ms. Hills of the outcome of its investigation, and, upon information and belief, AT&T's procedures precluded any further resolution at the store level. Although Mr. Paradine had boasted on prior occasions that he had received a "final warning" (for having called another Sales Representative a "dick"), Mr. Paradine remained employed by AT&T. While his sexual comments abated, he continued to comment negatively about Ms. Hills's pregnancy for the remainder of Ms. Hills's employment by AT&T, suggesting that her pregnancy made her less efficient and complaining about any breaks she was permitted to take.  AT&T failed to take any further actions to protect Ms. Hills.  Indeed, at the time AT&T fired Ms. Hills, her harasser remained employed by AT&T (although he subsequently was fired for mishandling cash transactions).

### C.     CYNTHIA ALLEN

66.     Ms. Allen worked for AT&T from approximately December 2012 until late April 2017, when she was terminated apparently because her accrued points balance violated Company policy.

67.     Ms. Allen worked in several AT&T stores in New York City, including 2540 Broadway, 30 Rockefeller Plaza, and 16 W. 34th Street (the "Empire State Building Store").  In September 2016, she transferred to the store at 920 South Rampart Blvd., Las Vegas, Nevada (the "Las Vegas Store"), where she worked for the rest of her tenure with AT&T.

68.     In New York, Ms. Allen began as a Sales Support Representative and was promoted to Retail Sales Consultant and then Team Lead/Retail Sales Consultant.  In these roles, she was responsible for selling cellphones, tablets, and cell and data plans, greeting customers, performing

some back-office functions, and—as Team Lead—opening and closing the store and supervising other Retail Sales Consultants.

69.     Ms. Allen performed well in these roles, had good relationships with her store managers and coworkers, and received positive reviews.

70.     While working for AT&T, Ms. Allen became pregnant three times; all of her pregnancies were high risk, and her first two pregnancies resulted in miscarriages.

71.     She sought assistance in obtaining excused leave for her pregnancy and related doctors' visits from her store managers, who provided her with paperwork from AT&T and instructed her to submit that paperwork to AT&T.  Ms. Allen was further informed that absences would be excused if they were accompanied by paperwork from a doctor.

72.     During her first two pregnancies, under an earlier version of the SAG policy, Ms. Allen sought and received excused leave for her pregnancy-related medical needs.

73.     In March 2016, while an employee at the Empire State Building Store, Ms. Allen learned that she was pregnant again.   During her third pregnancy, Ms. Allen suffered from hyperemesis gravidarum (extreme and constant morning sickness that prevented her from eating and staying sufficiently hydrated) and placenta previa (a condition where the placenta covers the cervix and can require an emergency caesarian section).  Both conditions were particularly acute, requiring ongoing and emergency medical care and restricting her ability to work or travel.

74.     Ms. Allen had to take several days off in each month from April through September 2016 to treat these conditions.  She followed the same procedures for obtaining excused absences for this pregnancy that she had used during her prior two pregnancies.  She was never informed by AT&T of any points accruing for her pregnancy-related absences and took efforts to ensure that

AT&T had the required documentation to excuse her absences.

75.     In September 2016, Ms. Allen left New York and transferred to the Las Vegas store as a Retail Sales Consultant; upon information and belief, her points balance at that time was around three, low enough to permit her transfer.

76.     Ms. Allen continued to experience pain and other debilitating conditions arising from her pregnancy, sometimes requiring hospitalization.

77.     After her transfer to the Las Vegas Store, Ms. Allen was unable to secure excused absences from AT&T and faced hostility from her store manager, Rick Church, when she sought information about excused absences or FMLA leave from AT&T under its SAG policy.  He often did not respond to her requests for such assistance.  AT&T assigned Ms. Allen points that led to her termination for the incidents for which she had requested Mr. Church's assistance.

78.     Despite Ms. Allen having informed the Company about her pregnancy and related medical conditions, AT&T took no steps to initiate discussions with Ms. Allen about reasonable accommodations for her disability or about her FMLA rights.

79.     Ultimately, Ms. Allen was forced to take FMLA leave from approximately Thanksgiving 2016 until her son was born on December 8, 2016.

80.     Mr. Church directed Ms. Allen to speak with Integrated Disability Services Center, a third party that managed AT&T's disability leave, to obtain FMLA or disability coverage for that leave; Ms. Allen attempted unsuccessfully to navigate this process until she gave birth, when she began her maternity leave.  Upon information and belief, she later accrued points for the dates for which she sought FMLA or disability leave.

81.     Ms. Allen returned to work on February 8, 2017.  At that time, Mr. Church informed

her that she was on a "final notice" because she had accumulated over twenty attendance points. Ms. Allen had believed these absences were classified as FMLA leave and thus excused by AT&T.

82.     When she questioned him about these points, Mr. Church informed Ms. Allen that he had no control over her points and that there was nothing he could do.  Instead, he indicated that CAG—which was responsible for approving and disapproving points—had control over any points she received.

83.     Ms. Allen sought assistance from her current and former store managers, AT&T's HR Department, and AT&T's CAG, but no one helped her correct her attendance record or explained to her how she had so many points of which she was unaware.

84.     She also tried to contest the points through AT&T's internal system and was told that points could be removed only with the approval of AT&T's Area Manager, Ltanya Robnett. Ms. Robnett was similarly unhelpful; she declined to remove the points, but agreed to speak further with AT&T's HR Department about Ms. Allen.  Ms. Allen never received any further response or information from Ms. Robnett.  Ms. Allen also sought assistance from an unknown corporate employee with authority to address attendance-related issues, but this employee did not respond to Ms. Allen's calls or emails.

85.     On or around March 21 and 22, 2017, Ms. Allen's newborn son became sick and required emergency medical care.  Mr. Church agreed in a text message to take Ms. Allen off the schedule and let her make up the time later in the week.  He further informed Ms. Allen that he could not assist her with FMLA leave and directed her to AT&T's MyWorkLife application (the "app").  But the app did not work, and Mr. Church did not offer other avenues for requesting leave. In Ms. Allen's experience, the app never worked for FMLA leave requests, and Ms. Allen was

unaware of any other avenues to petition for FMLA leave.

86.     When she returned to work on March 22, Ms. Allen learned that Mr. Church had not removed her from the schedule during her son's illness after all, and that AT&T had instead issued points for her absences, notwithstanding documentation from the doctor.

87.     Ms. Allen's son again required emergency medical care on or around March 31, 2017, and Ms. Allen contacted Mr. Church to be removed from the shift and provided him with documentation.  Ms. Allen returned to work the following day, on or around April 1, 2017.

88.     Throughout this period, Ms. Allen continued to follow up with Ms. Robnett and other AT&T corporate employees concerning the improperly unexcused points she had received. She received no assistance from the Company.

89.     Three weeks later after her son's illness, Ms. Allen was terminated, notwithstanding the fact that virtually all her absences were pregnancy- and/or FMLA-related.

## CLASS ACTION ALLEGATIONS

90.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring claims for AT&T's violation of Title VII (as amended by the PDA)

91.     Plaintiffs bring these claims on behalf of themselves and all non-exempt, non-managerial female employees in AT&T's corporate retail stores nationwide who were denied excused absences pursuant to AT&T's Sales Attendance Guidance policy.

92.     Plaintiffs assert the following classwide violations of Title VII:

a.     AT&T's actions constitute disparate treatment and evidenced discriminatory intent when the Company failed to include pregnancy, childbirth, or related

17

medical conditions in its SAG policy as conditions warranting exemption from point accrual, despite enumerating thirteen other reasons for excused absences.; and

b.      AT&T's SAG policy and practices also impose a disparate impact on women affected by pregnancy, childbirth, or related medical conditions.

93.     The proposed class is easily ascertainable.   The number and identity of class members may be determined from AT&T's records.

94.     The proposed class also meets all the requirements of Rule 23(a) and (b)(3):

a.      Numerosity:  Upon information and belief, the proposed class is at least several hundred individuals.  This class size is so numerous that joinder of all class members is impracticable.  In addition, the disposition of these individuals' claims as a class will benefit both the parties and the Court.

b.      Commonality:  Plaintiffs and the members of the proposed class they seek to represent have all been harmed by AT&T's SAG policy in that they have received points, discipline, and/or been terminated because of their sex (pregnancy).   The common questions in this case include, but are not limited to:

i.      Whether AT&T's SAG policy and/or its attendance practices treated pregnancy, childbirth, and related medical conditions differently from other absences in violation of Title VII (as amended by the PDA);

ii.     Whether AT&T's SAG policy and/or its attendance practices had a disparate impact on pregnant women; and

iii.    Whether AT&T's SAG policy and/or its conduct relating to the policy was malicious or in reckless indifference to Plaintiffs' and the putative class

18

members' legal rights.

c.      Typicality: Plaintiffs and the members of the proposed class were subject to the same unlawful policies, practices, and procedures and suffered similar harms.  All putative class members were subject to AT&T's SAG policy and all experienced adverse employment consequences from absences from to pregnancy, childbirth, and related medical conditions.  Plaintiffs and members of the proposed class were subject to the one-hour reporting requirement.  Plaintiffs' claims therefore are typical of the claims that could be brought by any member of the class, and the relief sought is typical of the relief that could be sought by each member of the class in separate actions.

d.      Adequacy of Representation:  Plaintiffs are able to fairly and adequately protect the interests of all members of the class, as they are challenging the same practices as the class as a whole, and there are no known conflicts of interest between Plaintiffs and members of the proposed class.  Plaintiffs have retained counsel who are experienced and competent in employment discrimination claims and in complex class-action litigation.

e.      Predominance and Superiority:  The common questions identified above predominate over any individual issues.  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all class members is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individual actions engender.  Because the losses, injuries, and damages suffered by each of the individual class members are small in the sense pertinent to class action analysis, the

19

expense and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress wrongs done to them.

   f. At the same time, important public interests will be served by addressing the matter as a class action.  Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for AT&T and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties.  The issues in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

   g. Pursuit of this action on behalf of a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and the members of the proposed class.

### FIRST CAUSE OF ACTION
**Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e(k)**
**Disparate Treatment Because of Sex (Pregnancy)**
**On Behalf of Plaintiffs and the Putative Class**

   95. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

   96. Upon information and belief, AT&T discriminated against Plaintiffs and the putative class members by treating them differently from other non-pregnant employees in their ability to obtain leave and/or accommodations for their pregnancies and/or related medical conditions or disabilities, in violation of Title VII, as amended by the PDA.

   97. Upon information and belief, AT&T had and continues to have a regular policy or procedure of unlawfully discriminating against women on the basis of their pregnancy, childbirth,

or related medical conditions.

98.     Upon information and belief, this regular policy or procedure was intentional.

99.     As a result of AT&T's unlawful sex discrimination, Plaintiffs and the class they seek to represent have suffered significant monetary loss, including loss of earnings, backpay, and other benefits; emotional pain and suffering; and other non-pecuniary losses.

**SECOND CAUSE OF ACTION**
**Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e(k)**
**Disparate Impact Because of Sex (Pregnancy)**
**On Behalf of Plaintiffs and the Putative Class**

100.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

101.    Upon information and belief, AT&T's SAG policy—which permits the Company to excuse absences for thirteen different reasons, including approved short-term disability; approved job accommodations; and leave protected by the FMLA, ADAAA, and other relevant federal, state, and municipal laws, but which does not mention pregnancy, childbirth, or related medical conditions and does not define what constitutes a permissible job accommodation—has a disparate impact on women, in violation of Title VII of the Civil Rights Act of 1964, as amended by the PDA.

102.    As a result of AT&T's unlawful sex discrimination, Plaintiffs and the class they seek to represent have suffered significant monetary loss, including loss of earnings, backpay, and other benefits; emotional pain and suffering; and other nonpecuniary losses.

**THIRD CAUSE OF ACTION**
**Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e(k)**
**Disparate Treatment Because of Sex (Harassment)**
**On Behalf of Plaintiff Katia Hills**

21

103.    Ms. Hills realleges and incorporates by reference, as if fully set forth herein, each and every allegation of this Complaint.

104.    AT&T discriminated against Ms. Hills on the basis of sex by permitting and failing to adequately remedy sexual harassment, of which it knew or should have known, to continue in violation of Title VII of the Civil Rights Act of 1964.

105.    As a result of AT&T's unlawful sex discrimination, Ms. Hills has experienced emotional pain and suffering and other nonpecuniary losses.

106.    AT&T's unlawful sex discrimination was undertaken with either malice or reckless indifference to Ms. Hills's rights under the law.

**FOURTH CAUSE OF ACTION**
**Title VII, 42 U.S.C. §§ 2000e-3(a), 2000e(k)**
**Retaliation**
**On Behalf of Plaintiff Katia Hills**

107.    Ms. Hills realleges and incorporates by reference, as if fully set forth herein, each and every allegation of this Complaint.

108.    AT&T retaliated against Ms. Hills, in violation of Title VII, because she opposed unlawful harassment, including but not limited to by lodging complaints with her supervisor and with AT&T's Human Resources Department.

109.    AT&T's adverse actions would dissuade a reasonable employee from making or supporting a charge of discrimination.

110.    As a result of AT&T's unlawful retaliation, Ms. Hills suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; and other nonpecuniary losses.

22

111.    AT&T's unlawful retaliation was undertaken either with malice or with reckless indifference to Ms. Hills's rights under the law.

**FIFTH CAUSE OF ACTION**
**Title I of the ADA, 42 U.S.C. §§ 12112(a), (b);**
**29 C.F.R. §§ 1630.2(o), 1630.4, 1630.9**
**Failure to Provide a Reasonable Accommodation**
**On Behalf of Plaintiffs Katia Hills and Cynthia Allen**

112.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

113.    AT&T discriminated against Plaintiffs, otherwise qualified individuals with disabilities, because of their known disabilities by failing to provide them with reasonable accommodations that were available and did not pose undue hardship, in violation of the ADA.

114.    AT&T failed to engage in an interactive process with each Plaintiff to identify the limitations resulting from their disabilities and potential accommodations that could overcome those limitations.

115.    AT&T's SAG policy further facially discriminated against Plaintiffs in violation of the ADA by failing to provide for leave or other reasonable accommodations related to their ADA-covered disabilities.

116.    As a result of AT&T's unlawful disability discrimination, Plaintiffs have suffered significant monetary loss, including loss of earnings and other benefits; emotional pain and suffering; and other nonpecuniary losses.

117.    AT&T's unlawful disability discrimination was undertaken either with malice or with reckless indifference to Plaintiffs' rights under the law.

23

**SIXTH CAUSE OF ACTION**
**FMLA, 29 U.S.C. §§ 2601 *et seq.***
**Interference**
**On Behalf of Plaintiffs Katia Hills and Cynthia Allen**

118.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

119.    AT&T violated the FMLA by unlawfully interfering with, restraining, or denying the exercise of Plaintiffs' FMLA rights by, *inter alia*, discouraging them from taking leave, imposing unnecessary and burdensome obstacles on their ability to request and access the leave, denying them the ability to use that leave, and awarding points—up to and including termination— for using that leave.

120.    As a result of AT&T's unlawful conduct in violation of the FMLA, Plaintiffs have suffered harm for which they are entitled to an award of damages and backpay.

121.    AT&T's unlawful actions constitute bad faith and were malicious, willful, and wanton violations of the FMLA for which Plaintiffs are entitled to an award of liquidated damages.

**SEVENTH CAUSE OF ACTION**
**FMLA, 29 U.S.C. §§ 2601 *et seq.***
**Retaliation**
**On Behalf of Plaintiffs Katia Hills and Cynthia Allen**

122.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each and every allegation of this Complaint.

123.    Plaintiffs were  "eligible employee" within the meaning of the FMLA.

124.    At all times relevant herein, AT&T was and is a "covered employer" within the meaning of the FMLA.

125.    AT&T violated the FMLA by unlawfully retaliating against Plaintiffs for exercising

their FMLA rights by, *inter alia*, refusing to credit qualifying absences as intermittent leave and instead penalizing them with "points," resulting in her discharge.

126.    As a result of AT&T's unlawful conduct in violation of the FMLA, Plaintiffs have suffered harm for which they are entitled to an award of damages.

127.    AT&T's unlawful actions constitute bad faith and were malicious, willful, and wanton violations of the FMLA for which Plaintiffs are entitled to an award of liquidated damages.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the following relief:

A.    Declaratory relief, including but not limited to a declaration that AT&T violated Title VII (as amended by the PDA), the ADA, and the FMLA;

B.    Injunctive relief, including but not limited to revision of AT&T's attendance policies, to comply with Title VII (as amended by the PDA), the ADA, and the FMLA;

C.    Compensation for loss of income;

D.    Compensatory and consequential damages, including for emotional distress;

E.    Punitive damages;

F.    Liquidated damages,

G.    Pre-judgment and post-judgment interest at the highest lawful rate;

H.    Costs incurred, including reasonable attorneys' fees to the extent allowable by law; and

I.    Such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial on the matters alleged herein.

Dated: May 14, 2018                         Respectfully submitted,

                                            */s/Gillian L. Thomas*
                                            Lenora M. Lapidus*
                                            Gillian L. Thomas**
                                            American Civil Liberties Union
                                            Women's Rights Project
                                            125 Broad Street, 18th Floor
                                            New York, NY 10004
                                            Telephone: (212) 549-2500
                                            llapidus@aclu.org
                                            gthomas@aclu.org

                                            Joseph M. Sellers*
                                            Kalpana Kotagal*
                                            Miriam R. Nemeth*
                                            Cohen Milstein Sellers & Toll PLLC
                                            1100 New York Avenue, Suite 500
                                            Washington, DC 20005
                                            Telephone:  (202) 408-4600
                                            jsellers@cohenmilstein.com
                                            kkotagal@cohenmilstein.com
                                            mnemeth@cohenmilstein.com

                                            Lynn A, Toops, No. 26386-49
                                            Cohen & Malad, LLP
                                            One Indiana Square, Suite 1400
                                            Indianapolis, IN 46204
                                            Telephone:  (317) 636-6481
                                            ltoops@cohenandmalad.com

                                            *pro hac vice admission pending
                                            **admitted pro hac vice

26

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 14, 2018, a copy of the foregoing Second Amended Class Action Complaint was filed electronically.  Notice of this filing will be sent to all parties of record by operation of the Court's Electronic Filing System.

*/s/Gillian L. Thomas*_____
Gillian L. Thomas

27