IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KATIA HILLS,<br><br>    Plaintiff,<br><br> -against-<br><br>AT&T MOBILITY SERVICES LLC a/k/a<br>AT&T MOBILITY LLC,<br><br>    Defendant. | Civil No.: 3:17-cv-00556-JD-MGG |

**LOCAL RULE 56-1 STATEMENT OF UNDISPUTED MATERIAL FACTS
REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1. Katia Hills began working at AT&T's Cassopolis Street store in Elkhart, Indiana, on April 7, 2014, when she was 23 years old. (Ex. A, DEF-684 (Plaintiff's offer letter, dated 3/24/14); Ex. B, DEF-1414 (Plaintiff's SAP History Data); Ex. C, DEF-534 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana, dated 5/28/15)).

2. Hills's first position at the Cassopolis Street store was as a Sales Support Representative. (Ex. D, pp. 21:6–22:6 (Hills Dep. Tr.); Ex. B, DEF-1414 (Plaintiff's SAP History Data)).

3. Hills was a Sales Support Representative for about 6 months. (Ex. B, DEF-1414 (Plaintiff's SAP History Data)).

4. Hills was then promoted to a Retail Sales Consultant ("RSC"), a position she remained in until she was fired just under a year later. (Ex. D, pp. 27:4–12 (Hills Dep. Tr.); Ex. E, DEF-40 (Termination Document regarding Plaintiff, dated 7/16/15); Ans. (ECF 66) ¶ 9)).

5. As an RSC, Hills's duties included selling cellphones and tablets, as well as various phone and data plans, and handling "all administrative aspects of the sale"; handling "service

inquiries from customers"; and generally providing "efficient, courteous customer service." (Ans. (ECF 66) ¶ 10; Ex. F, DEF-788 (RSC job description, dated 6/15/14)).

6. Hills loved sales and hoped eventually to progress to a management position with AT&T. (Ex. D, pp. 28:10–17; 219:22–221:2 (Hills Dep. Tr.)).

7. Hills learned she was pregnant with her first child in October 2014. (Ex. D, pp. 274:6–8 (Hills Dep. Tr.)).

**2011 SAG Policy**

8. When Hills first began working at AT&T, the Sales Attendance Guidelines ("SAG") policy, dated October 11, 2011 ("2011 SAG policy"), applied to all non-exempt, non-management employees in the region in which she worked. (Ex. G, DEF-81, 83 (2011 SAG policy)).

9. The 2011 SAG policy was supplanted as of May 1, 2015, by a revised version ("2015 SAG policy"). (Ex. H, DEF-141-44 (2015 SAG Policy)).

10. Among its purposes, the 2011 SAG policy was intended to notify employees and supervisors about what excused absences were available. (Ex. I, pp. 46:8-22 (Miller Dep. Tr.)).

11. Pursuant to the 2011 SAG policy, employees accrued points for unexcused absences, tardies, or early departures, which the policy called "occurrences." (Ex. G, DEF-82 (2011 SAG policy)).

12. Excused absences, tardies, or early departures did not count as "occurrences" under the 2011 SAG policy. (Ex. G, DEF-82 (2011 SAG policy)).

13. The 2011 SAG policy listed the following 11 kinds of absences as "excused": "approved leave of absence, scheduled vacation, scheduled excused days with pay, jury duty, bereavement, court subpoenas, military leave, short term disability, FMLA (or other federal or state mandated

leave), contractual time off for union business and any other absence that is mandated by law or Company policy." (Ex. G, DEF-82 (2011 SAG policy); Ex. I, pp. 44:16–45:5 (Miller Dep. Tr.)).

14. Both "other federal or state mandated leave" and "any other absence that is mandated by law or company policy as excused time away" included absences excused as an accommodation of a disability, pursuant to the Americans with Disabilities Act ("ADA"). (Ex. I, pp. 25:25-26:25; 82:2–84:7; 88:22–89:4 (Miller Dep. Tr.)).

15. The 2011 SAG policy also afforded supervisors the discretion "to consider extenuating/extreme circumstances where appropriate," and to decline to impose a point or fraction of a point for a given "occurrence," as well as any corresponding discipline. (Ex. G, DEF-83–84 (2011 SAG policy), Ex. I, pp. 129:9–13; 146:13–148:7 (Miller Dep. Tr.)).

16. Supervisors' discretion under the 2011 SAG policy included the discretion to excuse points that had accrued for employees using a "manager's discretion point removal." (Ex. I, pp. 124:19–125:7; 135:2–136:11 (Miller Dep. Tr.)).

17. The 2011 SAG policy did not list pregnancy-related absences among the kinds of absences that AT&T would deem "excused," and therefore spared a point or fraction of a point. (Ex. G, DEF-82 (2011 SAG policy)).

18. Under the 2011 SAG policy, an "approved leave of absence," was unpaid time off that covers any leave from 31 days to a year. (Ex. I, pp. 48:19–49:13 (Miller Dep. Tr.)).

19. However, absences due to a medical reason did not qualify for an "approved leave of absence." (Ex. I, pp. 49:14–50:6 (Miller Dep. Tr.)).

20. Employees accrued points for each occurrence according to the following progression: 0 points for the first five minutes an employee is tardy, after 6–15 minutes .25 point accrues, after

3

16–30 minutes .5 point accrues, after 31–120 minutes .75 point accrues, after 121 minutes 1 point accrues, and a day of absence is also 1 point. (Ex. G, DEF-83 (2011 SAG policy)).

21. Under the 2011 SAG policy, each attendance occurrence and associated point value remained on any employee's record for 180 days of active employment following the occurrence. (Ex. G, DEF-83 (2011 SAG policy)).

22. When an employee reached certain point thresholds without the points expiring, four levels of discipline were triggered. (Ex. G, DEF-83 (2011 SAG policy)).

23. The progressive discipline thresholds under the 2011 SAG policy were: a counseling notice at 4 points; a written warning at 5 points; a final written warning at 6 points; and termination at 7 points. (Ex. G, DEF-83 (2011 SAG policy)).

24. AT&T did not provide managers with any training or guidance as to how to exercise their discretion, including what was considered "extenuating/extreme circumstances" or what kinds of circumstances made it "appropriate" to excuse points. (Ex. G, DEF-84 (2011 SAG policy); Ex. I, pp. 129:9–130:10 (Miller Dep. Tr.)).

25. Starting in the summer of 2014, the Centralized Attendance Group ("CAG") was responsible for determining whether full day absences were excused or not, though managers still handled points for tardiness, half-days, or early departures. (Ex. J, DEF-2452–53 (COR Centralized Attendance Group (CAG) Powerpoint (May 2014)); Ex. I, pp. 154:1–156:10, 180:5–20 (Miller Dep. Tr.)).

**2015 SAG Policy**

26. The 2015 SAG policy went into effect on May 1, 2015. (Ex. H, DEF-141 (2015 SAG policy)).

27. The 2015 SAG policy applied to all non-exempt, non-management employees in the region in which Hills worked. (Ex. H, DEF-142 (2015 SAG policy)).

28. However, for points accrued up to and including April 30, 2015, the 2011 SAG policy still applied. (Ex. H, DEF-144 (2015 SAG policy)).

29. Just like the 2011 SAG policy, employees accrued points under the "Unexcused Absence Point System" for "occurrences" such as unexcused absences, tardies, or early departures. (Ex. H, DEF-142 (2015 SAG policy)).

30. Likewise, excused absences did not accrue points. (Ex. H, DEF-142 (2015 SAG policy)).

31. In the 2015 SAG policy, the list of excused absences was longer, and included certain new express categories (noted with italics, below):

- Approved Leave of Absence
- Scheduled/Approved Vacation
- Jury Duty
- Qualified Bereavement
- Military Leave
- Company recognized Holidays
- Approved Short Term Disability
- *Approved Job Accommodations*
- Federal/State/*Municipal* mandated Leaves (i.e., FMLA, *ADAAA*, etc.)
- *Company initiated closings (i.e., inclement weather, etc.)*
- Contracted Time Off (Union Business)
- Court Subpoena (excused to extent as outlined per Labor Agreement)
- *Approved/Company Mandated Time Off (i.e., [Excused Work Days with Pay] vacation, disciplinary time, etc.)*

(Ex. H, DEF-142 (2015 SAG policy)). (Emphasis added).

32. Under this version of the policy, workers with ADA-qualifying disabilities fit under both the "Approved Job Accommodations" excused absence category and the "Federal/State/Municipal mandated Leaves (i.e., FMLA, ADAAA, etc.") category. (Ex. K, pp. 290:7-292:2; 31:10-14 (Miller Dep. Tr. (*Allen*)).

5

33. The 2015 SAG policy still did not include pregnancy-related absences among the list of excused occurrences. (Ex. H, DEF-142 (2015 SAG policy)).

34. The points assessed for being late or absent remained the same in the 2015 SAG policy as in the 2011 SAG policy, but the new policy included some changes. (Ex. H, DEF-143 (2015 SAG policy)).

35. Each attendance occurrence and associated point value expired after 12 months of active employment following the occurrence, instead of 180 days. (Ex. H, DEF-143 (2015 SAG policy)).

36. There were still progressive discipline thresholds, with a counseling notice at 4 points and a written warning at 5 points, but under the 2015 SAG policy the final written warning came at 7 points, and termination at 8 points. (Ex. H, DEF-143 (2015 SAG policy)).

37. Additionally, supervisors no longer had discretion to waive points in "extraordinary circumstances." (Ex. H, DEF-143 (2015 SAG policy)).

38. The 2015 SAG policy remains in place, virtually unchanged, and is the subject of separate, ongoing litigation alleging Pregnancy Discrimination Act ("PDA") violations on behalf of a nationwide putative class. *See* Second Amended Class Action Complaint, *Allen v. AT&T Mobility Services, LLC*, No. 1:18-cv-03730 (N.D. Ga. filed June 14, 2019).

**AT&T's Disparate Coverage of Pregnancy**

39. Pregnancy-related absences were not excused under the 2011 SAG policy unless the employee qualified for short-term disability ("STD"), the employee had a pregnancy-related condition rising to the level of a disability under the Americans with Disabilities Act ("ADA"), or the employee qualified for leave under the Family and Medical Leave Act ("FMLA"). (Ex. G,

DEF-81-84 (2011 SAG Policy); Ex. I, pp. 65:21-24; 74:21–76:4; 108:19–109:21; 122:7–13; 126:25–127:10 (Miller Dep. Tr.)).

40. AT&T's STD policy only applied to employees absent for more than seven consecutive days. (Ex. I, pp. 66:11–19 (Miller Dep. Tr.)).

41. Pregnancy-related absences were not excused under the 2015 SAG policy unless the employee qualified for STD, the employee had a pregnancy-related condition rising to the level of a disability under the ADA, or the employee qualified for FMLA. (Ex. H, DEF-142 (2015 SAG policy), Ex. K, pp. 398:13–400:4; 403:10–404:8; 405:6–407:7; 440:20-441:14 (Miller Dep. Tr. (*Allen*)).

42. As AT&T's designated corporate representative, Miller did not know why pregnancy was not included as an independent basis for an excused absence in either the 2011 or 2015 SAG policy. (Ex. K, pp. 454:9–12 (Miller Dep. Tr. (*Allen*)).

43. Miller was not familiar with the requirements of the PDA. (Ex. K, pp. 425:5–16 (Miller Dep. Tr. (*Allen*)).

44. Further, Miller was not familiar with the 2015 U.S. Supreme Court decision, *Young v. United Parcel Service, Inc.*, which concerned employers' obligations under the PDA to accommodate pregnant workers. (Ex. K, pp. 427:17–21 (Miller Dep. Tr. (*Allen*)).

45. Miller testified that AT&T had created no specific guidance or training document for supervisory personnel or for AT&T's CAG staff after the *Young* decision, or at any other time, to address the needs of pregnant workers. (Ex. K, pp. 428:5–430:8 (Miller Dep. Tr. (*Allen*)).

46. Finally, Miller did not know whether pregnancy itself qualified as a disability. (Ex. K, pp. 398:13–399:11 (Miller Dep. Tr. (*Allen*)).

**Plaintiff's Pregnancy and Inability to Obtain Excused Absences**

47. When Hills learned she was pregnant in October 2014, she had only worked for AT&T for 6 months, and because FMLA leave requires 12 months of full-time employment, she did not qualify for FMLA leave until April 7, 2015. (Ex. A, DEF-684 (Plaintiff's offer letter dated 3/24/14); Ex. D, pp. 274:6-8 (Hills Dep. Tr.)).

48. Until May 26, 2015 when Hills went out on maternity leave, she did not need to take more than a day off at a time due to her pregnancy. Accordingly, she did not qualify for STD leave under AT&T's policy. (Ex. L, DEF-224-28 (Employee Attendance Report for Katia Hills)).

49. Hills's Retail Store Manager, Dion McGlown ("McGlown"), was aware that Hills was absent due to pregnancy prior to her FMLA entitlement, and testified that most of Hills's attendance points were due to her pregnancy. (Ex. M, pp. 204:4-9; 205:21–206:3; 209:1–25; 221:17–23 (McGlown Dep. Tr.)).

50. On December 23, 2014, McGlown contacted AT&T's FMLA Operations department to check on Hills's eligibility for FMLA, citing Hills's recent absences due to her pregnancy. (Ex. O, DEF-805 (FMLA Case Manager Tool, notes dated 12/23/14); Ex. M, pp. 200:13–202:14 (McGlown Dep. Tr.)).

51. McGlown's supervisor, Area Retail Sales Manager Jason Jenkins ("Jenkins"), was also aware that Hills was pregnant and experiencing absences and/or tardiness due to her pregnancy. (Ex. N, pp. 208:18–209:21 (Jenkins Dep. Tr.); Ex. M, pp. 221:5–23, 235:5–16 (McGlown Dep. Tr.))

52. Although the 2011 SAG policy permitted supervisors the discretion to excuse absences and discipline steps, AT&T managers did not exercise such discretion to excuse Hills's

8

pregnancy-related absences or discipline steps. (Ex. G, DEF-83–84 (2011 SAG policy); Ex. M, pp. 154:18–156:18; 162:2–163:6; 170:4–23 (McGlown Dep. Tr.); Ex. N, pp. 169:18-179:17; 187:10–188:8; 204:20–25 (Jenkins Dep. Tr.)).

53. By the time Hills qualified for FMLA leave on April 7, 2015, she had accrued 6 points and received a final written warning on April 24, 2015, making her just 1 point shy of termination under the 2011 SAG policy's 7-point threshold. (Ex. P, DEF-32-34 (Counseling Notice to Katia Hills, dated 12/27/14; Ex. Q, DEF-35-37 (Written Warning to Katia Hills, dated 2/14/15); Ex. R, DEF-38-39 (Final Written Warning to Katia Hills, dated 4/24/15)).

54. Hills's final weeks of pregnancy were especially difficult, and in the roughly 3 weeks before she went on maternity leave on May 26, 2015, Hills visited her ob-gyn or the emergency room 10 times. (Ex. C, DEF-534–41 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana, dated 5/4/15, 5/6/15, 5/11/15, 5/14/15, 5/18/15, 5/21/15); Ex. S, PL-272-412 (Plaintiff's medical records, St. Joseph Regional Medical Center, dated 5/6/15, 5/7/15, 5/8/15, 5/16/15); Ex. V, DEF-382-83 (FMLA Eligibility Form, Katia Patino (Hills), dated 5/19/15)).

55. As a result, after Hills became eligible for FMLA leave, she continued to need to miss work because of her pregnancy.

56. On May 4, 2015, Hills missed work for 8 hours. (Ex. T, DEF-240 (Employee Absence Calendar, Katia Patino (Hills), dated 1/14 – 12/15)). On that date, she called and then visited her ob-gyn. (Ex. C, DEF-540-41 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana)). and according to her doctor's notes during the office visit, Hills had "[h]ad a fever for about 5 days" and "all over body itching." (*Id.* at DEF-540). The doctor prescribed her medication, ordered a test of her bile acids, and noted that she may need additional medication if bile acids were elevated. (*Id.*)

9

57. On May 6, 2015, Hills went to her ob-gyn for her regular check-up. (Ex. C, DEF-540 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana)). Because she reported continued severe itching, her doctor directed her to go to the emergency room. (*Id.*)

58. Based on the elevated level of her bile acids, emergency room personnel diagnosed Hills with cholestasis. (Ex. S, PL-272-81 (Plaintiff's medical records, St. Joseph Regional Medical Center, dated May 6, 2015)). Emergency room personnel prescribed Hills an oral medication, ursodiol; injected her with the first of two doses of another medication, betamethasone; and advised that Hills' treating physician continue to test her bile acids weekly and the health of her fetus biweekly. (*Id.* &  PL-304, 319, 321, 324).

59. On May 7, 2015, Hills returned to the hospital to have the second dose of betamethasone injected. (Ex. S, PL-324, 30 (Plaintiff's medical records, St. Joseph Regional Medical Center, dated 5/7/15)).

60. On May 8, 2015, Hills missed work for 8.5 hours (Ex. U, DEF-363 (AT&T FMLA Operations letter to Katia Patino (Hills), dated 5/13/15) because she was experiencing vaginal bleeding and went to the emergency room. (Ex. S, PL-355-56 (Plaintiff's medical records, St. Joseph Regional Medical Center, dated 5/8/15)).

61. On May 11, 2015, Hills  visited her ob-gyn. (Ex. C, DEF-540 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana)). She reported that she had had a fever every night for the prior week, "worsening" shortness of breath and dizziness, as well as "occasional vomiting." (*Id.*)  The doctor's notes indicate that they discussed a plan to induce labor early, at 37 weeks, and would continue to monitor Hills's cholestasis. (*Id.*)

62. On May 14, 2015, Hills again saw her ob-gyn. (Ex. C, DEF-540 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana)). Her doctor drew bile and conducted other tests to continue to monitor her cholestasis and health of the fetus. (*Id.*)

63. On May 15, 2015, Hills missed 2.12 hours of work due to pregnancy. (Ex. T, DEF-240 (Employee Absence Calendar, Katia Patino (Hills), dated 1/14 – 12/15); Ex. V, DEF-382-83 (FMLA Eligibility Form, Katia Patino (Hills), dated 5/19/15)).

64. On May 16, 2015, Hills missed 8.5 hours of work (Ex. T, DEF-240 (Employee Absence Calendar, Katia Patino (Hills), dated 1/14 – 12/15)) because she went to the emergency room, reporting that she could not feel the fetus moving. (Ex. S, PL-386-87 (Plaintiff's medical records, St. Joseph Regional Medical Center, dated 5/16/15)).

65. On May 18, 2015, Hills had another ob-gyn appointment to monitor her cholestasis, and the health of her fetus. (Ex. C, DEF-539 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana, dated 5/18/15)).

66. On May 21, 2015, Hills again saw her ob-gyn to monitor her cholestasis, and the health of her fetus. (Ex. C, DEF-539 (Plaintiff's medical records, ObGyn Assocs. of Northern Indiana, dated 5/21/15)).

67. On May 26, 2015, Hills saw her ob-gyn. (Ex. C, DEF-537, Plaintiff's medical records, ObGyn Assocs. of Northern Indiana.)  According to her doctor's notes, Hills was "very upset/concerned about the time she [was] missing from work & possibly losing her job." (*Id.*, at DEF-539). Because Plaintiff was due to be induced within days due to her cholestasis diagnosis, her doctor agreed that it was appropriate for Plaintiff to begin her maternity leave, and noted that she would prepare the necessary FMLA paperwork. (*Id.*)

11

68. Less than a week later, on June 1, 2015, Hills gave birth. (Ex. S, PL-514-17 (Plaintiff's medical records, St. Joseph Regional Medical Center, dated 5/31/15–6/3/15)).

**AT&T's Firing of Hills**

69. On June 24, 2015, AT&T issued two final denial notices to Hills stating that her May 4 and May 16 absences would not be excused as FMLA leave. (Ex. W, DEF-92 (Employer Response to Employee Request for Family Medical Leave for 5/4/15 absence, dated 6/24/15)); Ex. X, DEF-91 (Employer Response to Employee Request for Family Medical Leave for 5/16/15 absence, dated 6/24/15)).

70. Hills was still on parental leave at the time these notices were issued, and was not aware of them. (Ex. D, pp. 367:24–368:6 (Hills Dep. Tr.)).

71. On July 2, 2015, AT&T's CAG personnel directed McGlown to terminate Hills because her May 4 unexcused absence and May 16 unexcused absence imposed 2 new points, which – when added to the 6 points she had accrued prior to becoming eligible for FMLA leave on April 7, 2015 – totaled 8 points, the threshold for discharge under the 2015 SAG policy. (Ex. Y, DEF-118 (email correspondence regarding Plaintiff's termination between CAG personnel to Dion McGlown, copying Jason Jenkins, dated 7/2/15)).

72. On July 13, 2015, Hills returned from maternity leave. (Ex. B, DEF-1414 (Plaintiff's SAP History Data)).

73. On July 16, 2015, McGlown informed Hills that AT&T had fired her due to her having reached 8 points under the 2015 SAG policy. (Ex. E, DEF-40 (Termination Document regarding Plaintiff, dated 7/16/15)); Ex. M, pp. 268:16–269:12 (McGlown Dep. Tr.)).

74. During Hills's employment, she was the only pregnant person at the Cassopolis Street store. (Ex. M, p. 222:6–16 (McGlown Dep. Tr.)).

75. Likewise, during her employment there, Hills was the only person AT&T fired for accruing points under the SAG policy. (Ans. (ECF 66) ¶ 37).

Date: November 15, 2021                                   Respectfully submitted,

                                                */s/ Gillian Thomas*
Gillian Thomas*
Lindsey Kaley*
American Civil Liberties Union
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 284-7356
Tel: (212) 519-7823
gthomas@aclu.org
lkaley@aclu.org

Lynn A. Toops, No. 26386-49
Lisa LaFornara, No. 35280-53
Cohen & Malad LLP
One Indiana Sq. Ste. 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com
Joseph M. Sellers*
Kalpana Kotagal*
Harini Srinivasan*
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., Suite 500
Washington, DC 20005
Tel: (202) 408-4600
jsellers@cohenmilstein.com
kkotagal@cohenmilstein.com
hsrinivasan@cohenmilstein.com

*Counsel for Plaintiff Katia Hills*

*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2021, I caused the foregoing *Local Rule 56-1 Statement of Undisputed Material Facts Regarding Plaintiff's Motion for Partial Summary Judgment* to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

/s/Gillian Thomas
Gillian Thomas