UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KATIA HILLS,

     Plaintiff,

     v.                                 Case No. 3:17-CV-556 JD

AT&T MOBILITY SERVICES LLC,

     Defendant.

**OPINION AND ORDER**

Plaintiff Katia Hills ("Hills") has moved for summary judgment on her disparate treatment claim against Defendant AT&T Mobility Services LLC ("AT&T"). Hills claims that AT&T automatically excused certain categories of absences, such as disability accommodation, but did not automatically excuse pregnancy-related absences. (DE 140 at 2.) Hills asserts that this policy resulted in her being unable to obtain excused absences, eventually resulting in her being terminated from AT&T. (*Id.*) For the reasons stated below, the Court denies Hills motion for summary judgment, finding that AT&T has put forth a legitimate, nondiscriminatory justification for why Hills did not receive accommodations.

A.    **Factual Background**

The facts, viewed in the light most favorable to AT&T, as the non-moving party, are as follows. On April 7, 2014, Katia Hills began working as a sales support representative at an AT&T store in Elkhart, Indiana. (DE 141-3 at 2; DE 141-4; DE 141-6 at 21:6–9.) Hills stayed in this position until October 2014, at which point AT&T promoted her to retail sales consultant. (DE 141-4; DE 141-6 at 27:4–12; DE 66 ¶ 9.) The same month she was promoted, Hills learned that she was pregnant. (DE 141-6 at 274:6–8.)

As a sales employee of AT&T, Hills was subject to AT&T's Sales Attendance Guidelines ("SAG") policy. The SAG policy was implemented in 2011 in order to establish expectations regarding employee attendance, while also providing consistent treatment to employees. (DE 141-9 at 2.) The SAG accomplished this by using a point system where employees accrued points for unexcused absences, tardies, or early departures, which the policy called "occurrences." (DE 141-9 ¶ 8.) Excused absences, tardies, or early departures did not count as "occurrences" under the SAG policy, and so would not accrue points. (*Id.* ¶ 2) Under the SAG, if there was an "occurrence," then employees would receive points commensurate with the length of that occurrence. For example, an absence of 6 to 15 minutes would accrue ¼ point, while any absence greater than or equal to 121 minutes would equate to 1 point missed.[1] (DE 141-9 ¶ 8.)

During the course of Hills' employment, she was subject to two versions of the SAG policy. When Hills started with AT&T, she was subject to a policy which was effective beginning on October 17, 2011 (the "2011 SAG" policy). (DE 141-9 at 2.) On May 1, 2015, the 2011 SAG policy was supplanted with a new policy (the "2015 SAG" policy). (DE 141-10 at 2.) While each SAG policy penalized employees' unexcused absences with points, or fractions of points, there were some differences between the two.

---

[1] Both the 2011 and 2015 SAG included the following point scale for unexcused absences, tardies, or early departures:

- 1 to 5 minutes tardy = Grace Period
- 6 to 15 minutes missed = ¼ point
- 16 to 30 minutes missed = ½ point
- 31 to 120 minutes missed = ¾ point
- Greater than or equal to 121 minutes missed = 1 point
- One day of absence = 1 point

(DE 141-9 ¶ 8; DE 141-10 ¶ 10.)

First, the policies listed different express categories of excused absences. The 2011 SAG provided a list of 11 express categories of excused absences which would not trigger the imposition of a point or a fraction of a point:

> Excused time away includes, but is not limited to . . . approved leave of absence, scheduled vacation, scheduled excused days with pay, jury duty, bereavement, court subpoenas, military leave, short term disability, FMLA (or other federal or state mandated leave), contractual time off for union business and any other absence that is mandated by law or Company policy.

(DE 141-9 ¶ 2.) The 2015 SAG policy included a longer list of excused absences. This list expressly included the above categories, but also had new expressly listed categories, such as "approved job accommodations," "company-initiated closings," and "company recognized holidays." (DE 141-10 ¶ 3.).[2] Second, there were changes concerning how the point system operated. While the 2011 SAG policy gave supervisors discretion "to consider extenuating/extreme circumstances where appropriate" and decline to impose a point or fraction of a point for an "occurrence," the 2015 SAG policy no longer provided supervisors this discretion. (DE 141-9 ¶ 12; DE 141-11 at 129:9–13, 146:13–148; DE 141-10.) Additionally, the point thresholds resulting in discipline differed. For example, in the 2011 SAG policy, once 7 points were accrued, termination resulted. (DE 141-9 ¶ 11.) The 2015 SAG policy changed the point threshold for termination to 8 points.[3] (DE 141-10 ¶ 11.) Finally, under the 2011 SAG policy, occurrences and associated point values expired after 180 days of active employment

---

[2] One area of dispute between the parties concerns these lists of excused absences. AT&T contends that, even though pregnancy-related absences were not expressly listed as a category of excused absences in the 2011 SAG, that the list was non-exhaustive. According to AT&T, under the 2011 SAG and 2015 SAG, Hills could have secured a "job accommodation" and been excused from work for a pregnancy-related absence that did not rise to the level of an ADA-qualifying disability. (DE 150 at 15; DE 150-36 ¶ 98.) Meanwhile, Hills asserts that the "*only* way for a pregnancy-related absence to be deemed excused, and therefore spared punishment, is for the pregnant worker to shoehorn her absence into" either short-term disability ("STD") leave, Family and Medical Leave Act ("FMLA") leave, or leave as an accommodation of disability under the ADA. (DE 141 at 5.)

[3] Under both policies, once a point threshold was reached, a review process was triggered where a higher-level manager reviewed and approved that course of discipline before administering it to the employee. (DE 150-12 at 6.)

following the occurrence, while occurrences and associated point values under the 2015 SAG policy only expired after 12 months of active employment following the occurrence. (DE 141-9 ¶ 10; DE 141-10 ¶ 11.)

Following Hills' pregnancy in October 2014, she began to accumulate points under the 2011 SAG for various "occurrences." Between November 11, 2014, and April 7, 2015, Hills had three unexcused absences and five tardies, resulting in Hills accruing 6 points. (DE 141-20 at 2; DE 150-16 at 2.). Hills accrued these initial six points when the 2011 SAG was in effect. (DE 141-9 at 2.) Starting on May 1, 2015, the 2015 SAG went into effect. (DE 141-10 at 2.) Between May 4, 2015, and May 21, 2015, Hills visited her ob-gyn or the emergency room ten times. (DE 143; DE 144.) For many of these visits, Hills was able to receive an excuse from AT&T. However, she was unable to avoid points on two dates. First, on May 4, Hills missed work because she had to visit her ob-gyn, which was not excused. (DE 143 at 8–9.) Second, on May 16, 2015, Hills went to the emergency room reporting that she could not feel her fetus moving, which was not excused. (DE 150-16 at 3; DE 144 at 116–17.) For those two absences, Hills received two more points, bringing her total number of points to eight. (DE 141-7 at 2.) After accumulating eight points, Hills was terminated. (*Id.*)

The parties dispute the reason for this termination. AT&T maintains that both "the 2011 and the 2015 SAG instructed that absences due to an approved job accommodation should be excused." (DE 150-36 ¶ 95.) AT&T asserts that both policies would cover "circumstances when a Sales Employee's own health, *whatever the condition*, affects her ability to come to work," and could do so under "short term disability, approved job accommodations, and Federal/State/Municipal mandated leaves," as well as other types of absences. (*Id.* ¶¶ 17, 33.) AT&T does not dispute that Hills was absent or tardy on the above dates, or that she accrued

points. Rather, AT&T claims that Hills accrued points because she failed to ever contact the Integrated Disability Service Center ("IDSC"), which was in charge of reviewing accommodation requests. (*Id.* ¶ 101–102; DE 150 at 19–20.) In other words, Hills could have secured excused absences, even though her pregnancy-related absences did not rise to the level of qualifying for short-term disability, disability under the ADA, or leave under the FMLA, had she contacted the group at AT&T who handled such requests. (*Id.* ¶ 39.)

On the other hand, Hills maintains that AT&T's policy was facially discriminatory, providing her with "no avenue for avoiding penalty for pregnancy-related absences" until she became eligible for FMLA coverage in April 2015. (DE 141 at 8 n.14.) According to Plaintiff, this made the policy a "but for" cause for her July firing, since she had obtained six points prior to becoming eligible for FMLA, putting her within two points of discharge. (*Id.*) Meaning, she would not have been fired "but for" the policy, which Hills asserts provided no path for a woman to avoid pregnancy-related absences unless her condition rose to the level of disability under the ADA, the employee qualified for leave under the FMLA, or the employee qualified for short-term disability. (DE 142 ¶ 39.)

On July 14, 2017, Hills filed a complaint in this Court, which sought declaratory and injunctive relief, as well as monetary damages. Hills filed her first amended complaint in February of 2018 (DE 16), then a second amended complaint on December 11, 2018 (the "Complaint"). (DE 61.) This Complaint included five causes of action:

I. Title VII, Disparate Treatment Because of Sex (Pregnancy)
II. Title VII, Disparate Treatment Because of Sex (Harassment)
III. Title I of the ADA, Failure to Provide a Reasonable Accommodation
IV. Interference in Violation of the FMLA
V. Retaliation in Violation of the FMLA

(DE 61 ¶¶ 38–69.) On November 15, 2021, Hills moved for partial summary judgment as to her first claim for disparate treatment because of sex under Title VII. (DE 140.) AT&T has filed a response to this motion (DE 150), and Hills has filed her reply. (DE 151.) Accordingly, the motion is ripe for review. In addition to her motion for summary judgment, Hills has filed a motion to strike certain portions of AT&T's response. (DE 152.)

The Court now considers both motions.[4]

**B.   Standard of Review**

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). There must be more than a mere scintilla of evidence in

---

[4] In addition to the motion for summary judgment and the motion to strike, there are also pending motions for leave to file supplemental authority (DE 159), leave to file a surreply (DE 158), as well as a motion requesting oral argument. (DE 154.) The Court will grant the motions for leave to file supplemental authority and the surreply (DE 158; DE 159), but deny the motion requesting oral argument as the Court finds oral argument on the instant motion unnecessary. (DE 154.) The Court will also grant Plaintiff's motion to seal, as it concerns medical documents. (DE 145.)

support of the opposing party's position and "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009); *Anderson*, 477 U.S. at 252. Instead, the opposing party must have "evidence on which the jury could reasonably find" in his or her favor. *Anderson*, 477 U.S. at 252.

## C.    Discussion

### (1)    Motion to Strike

In its statement of genuinely disputed facts, AT&T has taken the position that it "offered job accommodations to employees with health issues that did not rise to the level of a qualifying disability under the [ADA]." (DE 150-36 ¶ 99.) In her motion to strike, Hills asserts that this version of the events is "demonstrably false." (DE 153 at 3.) She argues that AT&T's factual contention is "belied by the record" and that AT&T fails to provide citations in support. (*Id.* at 3–5.) Hills asks the court to strike the portions of Defendant's Statement of Genuine Disputes of Fact and Additional Material Facts which relate to this "false" assertion. (*Id.* at 2.) Specifically, Hills moves the Court to strike paragraphs 14, 32, 39–41, 95, 98, 99, 101, 102, 108. (*Id.*)

"In general, a party who wishes to argue that portions of a statement of genuine issues contain errors or are inadmissible on evidentiary grounds may file a motion to strike those portions of the statement of genuine issues." *Mazur v. ZMC Auto Sales, Inc.*, No. 2:19-CV-333-TLS, 2021 WL 1978994, at *4 (N.D. Ind. May 17, 2021) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). The Seventh Circuit has previously affirmed district courts striking statements of material facts where the "assertions are unsupported by record citations and make conclusory arguments." *Perez v. Bd. of Educ. of the City of Chicago*, 576 F. App'x 615, 617 (7th Cir. 2014). However, motions to

strike are disfavored, "and usually only granted in circumstances where the contested evidence causes prejudice to the moving party." *Rodgers v. Gary Cmty. Sch. Corp.*, 167 F. Supp. 3d 940, 948 (N.D. Ind. 2016). Additionally, even without a motion to strike being filed, it is always "the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Smith v. Nexus RVs, LLC*, 468 F. Supp. 3d 1012, 1029 (N.D. Ind. 2020).

Here, the Court finds that the paragraphs Hills moves to strike have sufficient support in the record to warrant their inclusion. AT&T cites three pieces of evidence to support its assertion that the 2011 SAG offered job accommodations to employees whose health issues did not rise to the level of a qualifying disability under the ADA: (1) the 2011 SAG (DE 141-9); (2) AT&T's designated corporate witness's deposition in *Allen v. AT&T Mobility Services*, 1:18-cv-3730 (DE 150-5 at 287: 1-10, 290:7-291:10); and (3) the AT&T Integrated Disability Service Center Guide (DE 150-11 at 2, 11.) As the Court will explain below when addressing Plaintiff's motion for summary judgment, not only do AT&T's citations here support that it "offered job accommodations to employees with health issues that did not rise to the level of a qualifying disability under the [ADA]," but it also establishes that AT&T had a "legitimate, nondiscriminatory reason" for not excusing her absences: namely, that AT&T offered excused absences due to pregnancy-related conditions, but that Hills failed to request such accommodation through the proper channel.

Accordingly, the Court denies Plaintiff's motion to strike.

### (2) Motion for Summary Judgment

*(a) The Pregnancy Discrimination Act*

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In 1972, the United States Supreme Court held that discrimination because of pregnancy did not constitute discrimination because of sex. *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976). Congress then passed the Pregnancy Discrimination Act ("PDA"), which overruled *Gilbert*'s holding and described how discrimination against pregnancy was to be remedied. *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores E., L.P.*, No. 21-1690, 2022 WL 3365083, at *3 (7th Cir. 2022) (describing the history and purpose of the PDA). The PDA accomplished this by first declaring that sex discrimination in Title VII includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. § 2000e(k). The PDA then provided that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work[.]" *Id.*

A pregnancy discrimination claim may be brought under either a disparate-treatment or a disparate-impact theory of liability. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212–13 (2015). A disparate-impact claim "focus[es] on the *effects* of an employment practice, determining whether they are unlawful irrespective of motivation or intent." *Id.* However, Plaintiff has not brought a disparate-impact claim. (DE 61 ¶¶ 38–47.) Rather, Hills brings a disparate-*treatment* claim, which is a claim "that an employer intentionally treated a complainant less favorably than employees with the 'complainant's qualifications' but outside the complainant's protected class." *Young*, 575 U.S. at 212. Liability in a disparate treatment case

hinges "on whether the protected trait actually motivated the employer's decision." *Raytheon Co. v. Hernandez,* 540 U.S. 44, 52 (2003) (ellipsis and internal quotation marks omitted). There are two ways to prove a disparate treatment claim: "(1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*." *Young*, 575 U.S. at 213.

Hills attempts to show her disparate treatment claim through both direct and circumstantial evidence.[5] The Court addresses each theory in turn.

*(b) Direct Evidence*

First, Hills argues that AT&T "maintained a facially discriminatory policy that automatically penalized pregnant workers' absences (unless they happened to fit within a separate exception), while automatically excusing a wide range of absences unrelated to pregnancy[.]" (DE 141 at 11.) Hills claims that the policy "unquestionably treats pregnant workers like Hills worse than others 'similar in their ability or inability to work," in violation of the PDA" because "an absence caused by pregnancy is not, in and of itself, eligible for excused absence, and only certain pregnant workers will satisfy the conditions set forth by AT&T that would allow them to secure excused absences." (*Id.*)

However, the mere exclusion of a group, without an expression of an intent to discriminate against that group, is not direct evidence of disparate treatment. In *Young*, the

---

[5] The Court notes that Hills does not argue in much detail that the policy is direct evidence of discrimination. However, Hills repeatedly asserts that the policy is "facially discriminatory." (DE 141 at 11, 14.) Courts have indicated that "[a] leave policy that facially discriminates on the basis of pregnancy constitutes direct evidence of discrimination." *Huffman v. Speedway LLC*, 21 F. Supp. 3d 872, 876 (E.D. Mich. 2014); *Carson v. Lake Cnty., Indiana*, 865 F.3d 526, 533 (7th Cir. 2017) (using "facially discriminatory action" interchangeably with direct evidence of discrimination); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Since direct evidence of discrimination often comes through the form of facially discriminatory policies, the Court analyzes whether the policy itself is direct evidence of discrimination even though it is not explicitly brought up by Hills.

Supreme Court explained that one method of proving a disparate treatment claim is through "direct evidence that a workplace policy, practice, or decision relies *expressly* on a protected characteristic." *Young*, 575 U.S. at 213. Requiring that the policy rely *expressly* on a protected characteristic is consistent with the typical understanding of direct evidence as "evidence which, if believed, will prove the particular fact in question without reliance upon inference or presumption." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 574 (7th Cir. 2001). Finding discrimination from exclusion of a group requires the additional inference that the group was excluded because the employer intended to treat that group less favorably than similarly situated employees. A case from the Second Circuit illustrates this proposition. In *Legg v. Ulster County* 820 F.3d 67, 70 (2d Cir. 2016), the Second Circuit confronted a policy under which "employees injured on the job were eligible for light duty assignments." However, the policy excluded pregnant women from being eligible for light duty assignments because "their condition did not result from a line-of-duty injury." *Id.* Even though the policy excluded pregnant women from being eligible for light duty assignments, the Second Circuit concluded the policy did so on the facially neutral basis of "the *source* of one's inability to work" (i.e., whether the condition stemmed from on-the-job conduct). Other district courts have come to the same conclusion with similar policies. *See LaBarbera v. NYU Winthrop Hosp.*, 527 F. Supp. 3d 275, 291 (E.D.N.Y. 2021) (holding that the policy in front of them was "facially neutral" as it applied to "all healthcare workers" without mention of pregnancy or any other protected characteristic).

Similar to the policy considered in *Legg*, AT&T's 2011 SAG is facially neutral. Just like any other employee, a pregnant woman could qualify for the expressly listed categories of excused absences. For example, a pregnant woman, like any other employee, could get an excused absence for jury duty, the death of a family member, being subpoenaed to testify, being

called for military leave, or having to attend to union business. The policy never says, for instance, that "any employee may get an excuse for jury duty, except pregnant women." Rather, the policy applies equally to all employees on its face without mentioning pregnancy or any protected characteristic, only putting forth facially neutral categories of excused absences. On the basis of the policy's text alone, it would be impossible to conclude, without resorting to an inference, that it "was based upon an intent to discriminate against pregnant employees." *Legg*, 820 F.3d at 74; *Young,* 575 at 213 (direct evidence is "a workplace policy, practice, or decision [that] relies expressly on a protected characteristic"). Because AT&T's 2011 SAG is facially neutral, not expressly relying on any protected characteristic, the Court finds that it is not direct evidence of discrimination.

Lacking direct evidence of discriminatory intent is not unusual. The Seventh Circuit has explained that "direct evidence of discriminatory intent is difficult to obtain" and that the "vast majority of employment-discrimination claims will rest on circumstantial evidence." *Luster v. Illinois Dep't of Corr.,* 652 F.3d 726, 732 (7th Cir. 2011). Even though Hills has failed to present direct evidence of disparate treatment, Hills can still make out her claim though the *McDonnell Douglas* burden shifting framework, which exists in order "to allow a plaintiff to raise an inference of discrimination even in the absence of direct evidence." *Hoffman*, 256 F.3d at 574. The Court proceeds to consider Hills claim under this alternative framework.

(c) *McDonnell Douglas Burden Shifting Framework*.

Hills next argues that summary judgment is warranted under the *McDonnell Douglas* burden shifting framework. Under the *McDonnell Douglas* burden shifting framework, a plaintiff must first make out a prima face case by showing: (1) "that she belongs to the protected class"; (2) "that she sought accommodation"; (3) "that the employer did not accommodate her"; and (4)

"that the employer did accommodate others 'similar in their ability or inability to work.'" *Young,* 575 at 229. After making this initial showing, "the burden shifts to the employer to offer at step two a 'legitimate, nondiscriminatory' justification for denying the accommodation." *Wal-Mart,* No. 21-1690, 2022 WL 3365083 at *4. At this step, the burden of production is on the defendant, requiring them to produce evidence supporting a legitimate justification for denying the accommodation that is not discriminatory. *Wal-Mart,* No. 21-1690, 2022 WL 3365083 at *6. However, this justification "cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ('similar in their ability or inability to work') whom the employer accommodates." *Young,* 575 U.S. at 229. If an employer meets this burden, then the plaintiff can overcome such a showing "at the third step by 'providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's legitimate nondiscriminatory' reasons are not sufficiently strong to justify the burden," "giv[ing] rise to an inference of intentional discrimination." *Wal-Mart,* No. 21-1690, 2022 WL 3365083 at *4.

Hills argues that summary judgment is warranted because she (1) has established a prima facie case of pregnancy discrimination and (2) that AT&T has not and cannot justify the 2011 SAG policy's disparate treatment of pregnant workers such as Hills. (DE 141 at 13, 16.) AT&T, on the other hand, argues that Hills has (1) failed to make out a prima facie case and (2) failed to demonstrate that "no reasonable jury could believe AT&T's reasons for denying Plaintiff excused absences." (DE 150 at 11, 18.) For the purposes of this motion, the Court assumes that Hills has made out a prima facie case of discrimination. *See, e.g., Howard v. City of New York,* 302 F. Supp. 2d 256, 261 (S.D.N.Y. 2004) (assuming a prima facie case and denying a Plaintiff's summary judgment motion where the defendants "articulated a legitimate nondiscriminatory

13

reason for terminating the plaintiff and have presented evidence to support that defense"). However, the Court agrees with AT&T that it has provided a legitimate, nondiscriminatory justification for denying Hills an accommodation.

As its legitimate, nondiscriminatory justification, AT&T asserts that Hills was eligible to receive a job accommodation for her pregnancy-related conditions, but that Hills failed to properly request a job accommodation through the Integrated Disability Service Center ("IDSC"), which was in charge of reviewing accommodation requests." (DE 151-36 ¶ 101; DE 150 at 19–20.) This justification has three separate parts. First, AT&T must provide evidence that job accommodations were actually available to those with pregnancy-related conditions that did not qualify for disability under the ADA, FMLA, or short-term disability. (DE 155 at 5–7.). If no job accommodations were actually available to those with pregnancy-related conditions falling short of those categories, then Hills would have been refused an accommodation regardless of whether she called IDSC. If AT&T submits evidence in support of this, then AT&T would also have to provide evidence that it required all Sales Employees interested in requesting job accommodations to contact AT&T's third-party benefits administrator, the "IDSC," to initiate a request. If AT&T failed to submit evidence to this effect, and only required pregnant employees to jump through the hoop of contacting the IDSC, then such a policy would still be impermissibly discriminatory. Finally, AT&T would have to provide evidence that Hills failed to call the IDSC. (*Id.* at 13-14.) The Court finds that AT&T has submitted sufficient evidence in each of those respects.

First, in support of its assertion that employees with a pregnancy-related absence could be excused for health issues that did not rise to the level of qualifying disability under the ADA, AT&T cites three pieces of evidence: (1) the 2011 SAG (DE 141-9); (2) AT&T's designated

corporate witness's deposition in *Allen v. AT&T Mobility Services*, 1:18-cv-3730 (N.D. Ga.) (DE 150-5 at 287: 1-10, 290:7-291:10); and (3) the AT&T Integrated Disability Service Center Guide (DE 150-11 at 2, 11.) In her motion to strike, Hills asserts that these citations are not "actually supportive" and that the claim AT&T provided these job accommodations is "fictive." (DE 153 at 3, 5.) Hills claims that there is no genuine dispute that AT&T provided her "with no avenue for avoiding penalty for pregnancy-related absences until she became eligible for FMLA coverage in April 2015." (DE 141 at 8 n.14.) The Court disagrees. The three pieces of evidence cited by AT&T make it reasonable to infer that the 2011 SAG allowed employees with pregnancy-related conditions to receive excused absences as job accommodations even if the employee did not qualify for leave under the listed ADA, FMLA, or short-term disability categories.

First, AT&T directs the Court to the text of the 2011 SAG. By its own terms, the 2011 SAG provides a *non-exhaustive* list of what types of absences were excused. (DE 141-9 ¶ 2 ("Excused time away includes, *but is not limited to* [the following types of absences]").) In paragraph 20 of 2011 SAG, it also states that "[e]mployees who believe they need an accommodation should contact the Integrated Disability Service Center . . . to request a job accommodation." (*Id.* ¶ 20.) Even though these paragraphs do not explicitly describe what types of excused absences were available beyond the enumerated list, they support that the 2011 SAG contemplated excused absences beyond those listed. Furthermore, even though there may not, in fact, be other ways to secure excused time away beyond those enumerated, having more categories beyond those explicitly enumerated would certainly not be inconsistent with the 2011 SAG given that it expressly states that "excused time away includes, *but is not limited to*" the eleven listed categories. (*Id.*)

Hills argues that although the 2011 SAG's text indicates that excused absences beyond those listed were available in some manner, it does not specifically support that employees with health issues that did not rise to the level of disability under the ADA were entitled to job accommodations. (DE 153 at 6.) In other words, Hills asserts that the 2011 SAG does not describe how an employee would be eligible for the unenumerated categories of excused absences. What Hills says about the 2011 SAG is correct: the 2011 SAG does not go on to describe what other excused absences exist or when an employee is eligible for them. The Court agrees that, by itself, the 2011 SAG would not be enough to show that employees with a pregnancy-related condition not rising to the level of qualify for ADA, FMLA, or short-term disability leave could obtain excused absences. However, AT&T's two other citations do provide this necessary support.

AT&T cites deposition testimony from designated corporate witness, Heather Miller, who testified as follows in the pending case *Allen v. AT&T Mobility Services*, 1:18-cv-3730 (N.D. Ga.):

> Q:  Okay. And so at that point, if you're not eligible for FMLA, then there's a question of whether you might be able to claim job accommodation for a disability-related reason?
>
> A. That is correct . . . Or they could just do a job accommodation. *It wouldn't necessarily need to be for disability, but just a time off job accommodation request is what it's called.*
>
> Q. . . . Okay. And I — as an employee, how do I know that job accommodations doesn't mean disability? That was your sort of description of it earlier was that job accommodations related to disability. I just want to understand, like, if I'm a pregnant worker, how do I know that that includes me?
>
> A. . . . Now, I say job accommodations is part of disability in a sense that if you file for disability, it's concurrent with FMLA. It can be part of a job accommodation in the long run . . . It's just — *I don't want it to be strictly saying it's a disability. That's — that's all I'm trying to say is you can use it for illness, too*.

(DE 150-5 at 287:1–10, 290:7–291:10 (emphasis added).) Miller specifically testifies that "job accommodations" were not concurrent with FMLA and that it could be used in a broader sense "for illness, too." She also testifies that a "job accommodation" would not "necessarily need to be for disability." (*Id.*) This deposition testimony supports that pregnant workers could qualify for an excused absences as "job accommodations" even if the employee did not qualify for ADA, FMLA, or short-term disability leave.

Hills argues that AT&T's citations to Miller's testimony are misleading, fail to provide adequate support, and that they should be struck. Hills claims that Miller's testimony is "irrelevant" to AT&T's assertions about Hills' access to job accommodations under the 2011 SAG Policy. (DE 156 at 4 n.5.) Miller's testimony is from the pending *Allen v. AT&T Mobility Services* litigation in the Northern District of Georgia, which Hills asserts concerns the 2015 SAG policy, not the 2011 SAG policy. However, Hills cites nothing in the record showing that that this deposition testimony pertains *only* to the 2015 SAG policy. (DE 156 at 4.) Additionally, even if Miller were speaking only about the 2015 SAG at that portion of the deposition (which is unclear based on the record in front of the Court), her testimony could still have some relevance. After all, if "job accommodations" in the 2015 SAG allowed pregnant employees with conditions which did not make them eligible for FMLA, short term disability, or ADA leave to receive excused absences, then it is reasonable to infer that the "job accommodations" alluded to in the 2011 SAG would allow similar absences.[6] At summary judgment, a court must make all reasonable inferences in favor of the non-moving party. Based on the testimony above from

---

[6] Even though the enumerated list of "excused absences" in the 2011 SAG does not mention "job accommodations," the policy does suggest that "job accommodations" in some form existed: in paragraph 20 of 2011 SAG, it states that "[e]mployees who believe they need an accommodation should contact the Integrated Disability Service Center . . . to request a job accommodation." (DE 141-9 ¶ 20.)

Miller, it is reasonable to believe that the "job accommodations" alluded to in the 2011 SAG could cover pregnant employees with pregnancy-related conditions that would not qualify for leave pursuant to the ADA, FMLA, or short-term disability categories. [7]

AT&T's Integrated Disability Service Center Guide ("IDSC Guide") from 2012 further supports this finding. The IDSC Guide instructs that "[i]f your illness, injury or condition requires a reduced work schedule or time off work (no matter the duration) that does not qualify for disability benefits under your disability benefits plan and you are not eligible for FMLA, a job accommodation specialist will assist you with your request." (DE 150-11 at 2, 11.). Plaintiff argues that the IDSC Guide should not be credited because it was merely a *procedural* manual, which did not provide employees with any substantive rights. (DE 157 at 6.) The Court agrees that the guide appears to be largely procedural in nature, as it specifies that it is intended to "tak[e] [an employee] through the process of applying for short-term disability (STD) benefits, filing a Workers' Compensation (WC) claim and arranging for your return to work and/or requesting job accommodations." (DE 150-11 at 5.) However, at this stage, the Court must make all reasonable inferences in favor of the non-moving party, and it would be unusual for a procedural guide to detail a process for an individual who has an injury or illness not rising to the level of disability and who is not eligible for FMLA, ADA, or short-term disability leave to get assistance with their request for time off if AT&T did not actually envision giving them excused time off.

---

[7] Hills also argues that Ms. Miller's *Allen* deposition testimony contradicts testimony in the instant case. In support of this argument, Hills cites to Exhibit I of her summary judgment motion, at page 431. (DE 151 at 7; DE 141-11.) Exhibit I is included. (DE 141-11.) However, Hills fails to provide the Court with the page of the deposition she is referring to. (DE 141-11 (only going through page 180 of Millers' deposition).) Accordingly, the Court does not consider it for the purposes of this motion. The Court notes, however, that even if it did have the evidence Hills claims she possesses, it would deny the motion for summary judgment given that the Court must make all reasonable inferences in favor of AT&T.

Given Miller's testimony, the IDSC Guide, and the fact that the 2011 SAG expressly contemplates excused absences which do not appear on the enumerated list, the Court finds that a reasonable jury could conclude that pregnant employees at AT&T were able to request job accommodations, and receive excused absences, even if their pregnancy-related condition did not allow them to qualify for FMLA, ADA, or short-term disability leave.

AT&T also provides sufficient evidence for a reasonable juror to conclude that pregnant employees and non-pregnant employees at AT&T alike had to contact the IDSC in order to initiate a request for a job accommodation. AT&T cites the IDSC guide, which, as the Court previously explained, instructs employees with conditions which did not qualify for disability or eligibility under the FMLA to contact a job accommodation specialist at the IDSC for assistance. (DE 150-36 ¶ 100; DE 150-11 at 11.) AT&T also directs the Court to a training presentation for supervisors which instructs AT&T supervisors that they should refer "Employees to the IDSC to request a job accommodation when . . . the request is for time off from work for any duration and the employee has exhausted FMLA or is not eligible." (DE 150-14 at 24.) In addition, there is evidence that Hills was repeatedly told to contact AT&T, even though she would not have qualified for leave under FMLA, short term disability, or the ADA. For example, Hills was told by her manager, Dion McGlown, that after she expressed frustration about accruing points, he "told her she needs to talk to her doctor, she needs to go through IDSC." (DE 150-6 at 226:13–227:3.) Furthermore, AT&T sent Hills multiple documents as she accrued points, in August and December of 2014, and then in February and April of 2015. (DE 150-27; DE 141-18; DE 141-19; DE 141-20.) These documents provided Hills with the admonition that "[i]f the [employee] would like us to consider a reasonable accommodation due to a medical condition, they must make a request for a job accommodation – to the IDSC[.]" (*Id.*) The guide, presentation, and

admonitions to Hills are sufficient to allow a reasonable juror to conclude that employees at AT&T had to contact IDSC to initiate a request for a job accommodation.

Finally, AT&T has filed sufficient evidence to allow a reasonable person to conclude that Hills failed to file a job accommodation request with the IDSC. Hills testified at a deposition that she had never heard of the "Integrated Disability Service Center" and did not know what "IDSC" stood for. (DE 150-3 at 323:20–324:11.) This admission, alongside the admonition by her manager and written warnings sent to her by AT&T advising her that she could contact the IDSC to request job accommodations, would allow for a reasonable juror to conclude that Hills failed to request a job accommodation for each of her absences.

Accordingly, the Court finds that AT&T has met its burden at step two of the *McDonnell Douglas* framework. AT&T has provided sufficient evidence to support that it had a legitimate, nondiscriminatory justification for denying Ms. Hills an accommodation. Namely, that despite accommodations for pregnancy being available, Hills failed to request an accommodation through the channel that AT&T had designated for accommodation requests to be submitted through.

In her reply, Hills argues that AT&T's "putative legitimate, nondiscriminatory reasons for firing Hills amount chiefly to smearing her . . . because she did not seek a 'job accommodation.'" (DE 151 at 14.) Hills claims that AT&T fails to answer the "salient question" about why AT&T did "not simply treat pregnancy 'the same' as absences caused by disability, or a jury summons, or military service, or union duties? Put differently — why, when AT&T accommodated so many, could it not accommodate *all* pregnant workers as well" (*Id.*) This assertion is premised on Hills' view that the 2011 SAG policy provided "automatic" eligibility for excuses as to the enumerated categories of absences, but did not provide "automatic"

eligibility for excuses as to pregnancy-related conditions. (DE 151 at 3–4, 11.) According to

Hills, those with pregnancy-related conditions were per se guaranteed a penalty if they did not

fall under the enumerated conditions in the 2011 SAG. This argument fails for two reasons.

First, Hills misdescribes AT&T's burden at step two of the *McDonnell Douglas* analysis.

In *EEOC v. Wal-Mart*, the Seventh Circuit explained that at step two, the employer does not

need to explain why it "accommodated so many, [but] could . . . not accommodate pregnant

women as well[.]" No. 21-1690, 2022 WL 3365083, at *6. Rather, this inquiry takes place at step

3, where Hills bears the burden of showing "that the employer's proffered reasons are in fact

pretextual." *Young*, 575 U.S. at 229. In this case, for example, Hills could show that a significant

number of non-pregnant employees received excused absences when their conditions did not fall

under the enumerated list while categorically failing to give excused absences to employees with

pregnancy-related conditions whose conditions did not fall under the enumerated list. *Id.*

(explaining that Young could make out step 3 by showing "that UPS accommodates most

nonpregnant employees with lifting limitations while categorically failing to accommodate

pregnant employees with lifting limitations.") Hills could also point to the non-exhaustive

enumerated list in the 2011 SAG, which fails to explicitly mention pregnancy, and could suggest

that its reason for failing to accommodate pregnant employees is not sufficiently strong. *See id*

("Young might also add that the fact that UPS has multiple policies that accommodate

nonpregnant employees with lifting restrictions suggests that its reasons for failing to

accommodate pregnant employees with lifting restrictions are not sufficiently strong.").

However, at step two, an employer meets its burden "by offering a legitimate reason" for not

accommodating Hill "that was not discriminatory." *Wal-Mart Stores,* No. 21-1690, 2022 WL

3365083, at *6. As explained above, AT&T met this burden.

Second, Hills argument concerning "automatic" absences is unconvincing. Hills never truly explains what she means by "automatic" eligibility for absences, except to say in a footnote that it refers to how some employees were *"per se* entitled to avoid penalty" if they fell under an enumerated category, while Hills, as a pregnant woman, was "*pre se* guaranteed such penalty." (DE 151 at 6 n.6.) However, the Court has already found that there is sufficient evidence in the record to allow a reasonable person to conclude that pregnant women were not per se ineligible to receive excused absences simply because they did not fall under one of the enumerated conditions on the 2011 SAG's list. *Supra* pp. 12–21. Based on the evidence before the Court, whether pregnant employees were able to receive excused absences outside those expressly enumerated is an issue that is genuinely disputed.

Accordingly, because the Court has determined that AT&T put forth a legitimate, nondiscriminatory justification for its action, and because Hills does not assert any further argument as to step three, the Court denies Hills motion for summary judgment.

## D.   Conclusion

For the reasons stated above, the Court GRANTS the motions requesting leave to file surreply and motion for leave to file supplemental authority. (DE 158; DE 159.) The Court also GRANTS Plaintiff's motion to seal. (DE 145.) However, the Court DENIES Plaintiff's motion for summary judgment (DE 140.) The Court also DENIES Plaintiff's motion to strike (DE 152) and Plaintiff's motion requesting oral argument (DE 154.)

SO ORDERED.

ENTERED: September 16, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court